Billy J. CONLEY, Appellant,

v.

BURLINGTON NORTHERN
RAILROAD COMPANY,
Respondent.

No. WD 37005.

Missouri Court of Appeals,
Western District.

March 4, 1986.

Application to Transfer Denied
June 17, 1986.

---

Robert L. Shirkey and James M. Slone, Kansas City, for appellant.

Spencer J. Brown and Thomas M. Deacy (Deacy & Deacy, of counsel), Kansas City, for respondent.

Before CLARK, C.J., and PRITCHARD and BERREY, JJ.

PRITCHARD, Judge.

Plaintiff, Conley, brought this action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for injuries to his left ankle occasioned when he descended from a boxcar and stepped into a hole that was partially filled with snow and which covered a discarded brakeshoe, on November 17, 1979. Conley was then engaged in his duties as a special agent for defendant railroad. According to Conley, the heel of his left foot landed on the edge of the brakeshoe which gave way causing him to turn his ankle.

Conley submitted his case to the jury in Instruction No. 5, hypothesizing as defendant's negligence its failure either to provide reasonably safe conditions for work, or reasonably safe methods of work, and that "such negligence resulted in whole or in part in injury to plaintiff."

Defendant's submitted Instruction No. 7 was given:

"You must find plaintiff Conley contributorily negligent if you believe:

First, either:

plaintiff knew or by using ordinary care should have known his performance of his regular duties was reasonably likely to cause him substantial harm but continued to perform such duties, or plaintiff failed to advise defendant that his performance of his regular duties was aggravating his ankle condition, and

Second, plaintiff, in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence of plaintiff Conley directly contributed to cause his injury."

The jury returned a verdict for Conley for $36,000. Thereafter, upon defendant's Motion to Reduce Award and Stay Entry of Judgment, and upon the authority of *Clark v. Burlington Northern, Inc.,* 726 F.2d 448 (8th Cir.1984), the trial court set off $39,-641.16 in disability payments paid by defendant to Conley, against the verdict, thus reducing the verdict to zero, and adjudged that Conley take nothing from defendant.

In Point II, Conley contends that the giving of Instruction No. 7 was error because it was unsupported by the evidence, in that there was no evidence that he knew or should have known that the continued performance of his regular duties was reasonably likely to cause him substantial harm, and there was no evidence that he failed to advise defendant that his ankle condition was aggravated by his performance of his regular duties.

At the outset, it should be noted that although 45 U.S.C.A. § 53 speaks of the contributory negligence of the employee as diminishing the damages in proportion to the negligence attributable to him, this

case is not one of that doctrine. Rather, it is one of the doctrine of avoidable consequences because the factual submission of Instruction No. 7 did not occur either before or at the time of defendant's negligence or the initial injury to Conley. See 22 Am.Jur.2d, Damages, § 31, p. 52, where it is said, " * * * avoidable consequences generally arise after the wrongful act of the defendant. That is, damages may flow from the wrongful act or omission of the defendant, and if some of those damages could reasonably have been avoided by the plaintiff, then the doctrine of avoidable consequences prevents the avoidable damages from being added to the amount of damages recoverable." The result of contributory negligence under the federal act and the doctrine of avoidable consequences is the same—the diminution of damages recoverable. Under either doctrine, however, there must be supportive substantial evidence for those affirmative defenses.

On the day Conley turned his ankle, he so advised Fredrick, his supervisor, and then went home. On the following day, he went to Truman Medical Center emergency room where his ankle was x-rayed and he was advised to see an orthopedist. Conley advised Fredrick of that, and received authorization to see the company doctor, Dr. Young, who referred him to Dr. Joseph C. Gottsch, an orthopedic surgeon. Dr. Gottsch saw him on November 20, 1979, then diagnosing his injury as strained ligaments and tendonitis, lateral aspect of the left ankle, and recommending, "I don't believe he should attempt to work yet. He should continue to restrict activity concerning standing and walking and switch to application of heat." Dr. Gottsch acknowledged on cross-examination he wrote a report (delivered by Conley to Fredrick), and shared with Conley his opinion and diagnosis, that he should limit standing, and suggested that he wear an elastic bandage support.

Dr. Gottsch saw Conley again on November 23, 1979, at which time he believed that Conley could return to work but should wear an elastic bandage and try to limit the amount of standing and walking, if he did work, if at all possible. Dr. Gottsch then wrote a letter authorizing Conley to return to work. The kind of injury he found would take 4 to 6 weeks minimum to heal, and he did not think it would have a permanent effect.

Conley then undertook light duty for 2 or 3 days, after which he was notified by Fredrick to go back on his regular 3:00 p.m. shift, which he did. It should be noted that Conley's duties required him to walk the railroad tracks in defendant's yard, to climb onto and off of railroad cars in his special agent job, and to protect trains from vandals, unauthorized persons, and for security.

Conley continued his regular duties until August 6, 1982, when he again saw Dr. Gottsch, telling him that he had twisted his ankle the day before, and had done so many, many times since that November, 1979, injury. Since then, he had continued to work and had not missed any work because of the injury. Dr. Gottsch then found that Conley had a slight left limp, and no gross deformity or swelling of the left ankle as compared with the right. There was some tenderness to palpation of the left ankle and on its inversion and eversion, but there was not much discomfort in moving the ankle upward and downward. At that time Dr. Gottsch thought that Conley had a ligamentous and tendonitis strain of the left ankle which caused some instability and predisposed him to having episodes of pain and discomfort. The doctor felt that walking on uneven surfaces and climbing would predispose him to have recurrent episodes of pain, and he recommended that he wear an elastic ankle support when he was going to walk on uneven surfaces and climb, and to use applications of heat when he had acute episodes of pain. He told Conley that he could work with restrictions, and apparently wrote a letter to that effect.

At the time of Conley's initial injury he was wearing a Wellington type high top-boot with a strap to hold it on. During 1980, and after, as he worked, he wore a

high topped military lace-up type of boot, along with the elastic, to protect his ankle.

On December 8, 1982, Dr. Gottsch saw Conley again, but did not find much tenderness in the ankle. On December 20, 1982, Conley did have a slight limp, but he did not tell him he should not go to work. On December 29, 1982, Dr. Gottsch wrote a letter saying that Conley might attempt to return to work with restrictions-that he wear a high-top shoe (which Conley had been doing) and an elastic bandage on the left ankle.

On February 14, 1980, Conley told claims agent, Landreth, of the November 17, 1979, ankle injury, that he had problems with it now and then—it would give out on him now and then, with minor pains, but nothing incapacitating. The ankle had not quite recovered the strength it had lost. In 1981, the ankle was about the same, but as time progressed, Conley's severe problems when he got home would last a little bit longer.

Conley's supervisor, Fredrick, was promoted in March, 1981, and Whitecotton succeeded him as special agent in charge.

Conley testified that he would reinjure his ankle numerous times by stepping in a hole, on brakeshoes, and switchstands covered with snow in 1982. During that year his ankle got increasingly worse. He would soak it and apply heat and ice packs to it when off duty so when he went back to work, it would have restored itself to some degree. Conley told Whitecotton that he had injured his ankle in the yard in 1979, and they discussed Conley's limping. Whitecotton told him to see a doctor and have him mail a report, which Conley did on August 6, 1982, and he and Whitecotton later discussed the letter (report) of the visit with Dr. Gottsch. Whitecotton told Conley that if he did not continue to do his assigned work there were other applicants who would love to have his job. On one occasion, December 31, 1982, Whitecotton wrapped Conley's ankle with the elastic bandage, and then told him to go out and complete his assigned duties. Conley had seen Dr. Gottsch on December 20, 1982, who prescribed medication, about which

Conley and Whitecotton talked. Later Whitecotton told him that the railroad would not allow him to work under the influence of medication, which Conley had apparently done for 1½ days after taking it.

Conley then went to see a Doctor Hopkins at K.U. Medical Center, and called Whitecotton from his office. Whitecotton then told Conley that he had talked with Dr. Gottsch, who was going to give Conley a letter stating that he could return to work at 100%, and told him to go to Dr. Gottsch's office and pick up the letter, which Conley did, and took it to Whitecotton. That letter stated, "May attempt to return to work with the restrictions that he wear a high topped shoe and elastic bandage on left ankle."

On January 1, 1983, Conley was checking trains with a lot of trailers on them. He checked 56 or 57 trailers and the jumping from them to the ground caused his ankle "great agitation" and it swelled. At the end of the four hour shift, he took off his boot and the ankle was swollen and red. He soaked it that night, and the pain was such that his wife took him to Menorah Hospital where he was told not to work until he saw an orthopedic surgeon. That was the last day that Conley worked for defendant.

These representative federal cases hold: It is improper for the court to instruct the jury on matters for which there is no support in the record. *Ybarra v. Burlington Northern, Inc.*, 689 F.2d 147 (8th Cir.1982); if there is no evidence from which a jury could find a lack of due care by a Federal Employers' Liability Act plaintiff, it is generally fundamental error for the district court to give a contributory negligence instruction. *Wilson v. Burlington Northern, Inc.*, 670 F.2d 780 (8th Cir.1982), cert. denied, 457 U.S. 1120, 102 S.Ct. 2934, 73 L.Ed.2d 1333; evidence introduced at trial must warrant the giving of an instruction, and when dealing with an issue of medical causation, a considered medical judgment is necessary, expressed in terms of probability rather than possibility, before an in-

struction may be given. *Higgins v. Martin Marietta Corp.*, 752 F.2d 492 (10th Cir. 1985); it is improper for a court to instruct on a proposition of law about which there is no evidence. *Collins v. Metropolitan Life Insurance Co., Inc.*, 729 F.2d 1402 (11th Cir.1984). Missouri law is the same. *Hart v. Midkiff,* 321 S.W.2d 500, 508[10] (Mo. 1959), "An instruction which is not supported by the evidence is erroneous in that it is misleading and confusing. (Citing cases.)" The *Hart* case held also, page 508[11], an instruction on elements of damages not supported by the evidence was erroneous, because "Assuming, as we must, that the jury followed the instruction, we cannot say that this error did not influence the amount of the verdict. (Citing cases.)" See also *Brassfield v. Sears*, 421 S.W.2d 321 (Mo. 1967), decided after the adoption of MAI; *Moore v. Kopp*, 400 S.W.2d 176 (Mo. 1966); *Samuels v. Klimowicz*, 380 S.W.2d 418 (Mo. 1964); *Sutton v. Fox Missouri Theatre Company*, 356 S.W.2d 41 (Mo. 1962); and the large number of cases collected in 40 Mo.D.–62, West Key No. 252(1) Trial.

The evidence set forth above concerning Conley's work history and his medical treatment and advice fails to show that he was ever advised by a medical practitioner that his continued performance of his regular duties, after he was injured on November 17, 1979, was reasonably likely to cause him substantial harm. Certainly, Conley, as a layman, would not have the medical knowledge to realize that his continued work might cause him substantial harm. All that he was advised by Dr. Gottsch at the outset was not to attempt to work yet and to continue to restrict activity concerning standing and walking, and to use heat application. On November 23, 1979, Dr. Gottsch believed that Conley could return to work, but should wear an elastic bandage and try to limit the amount of standing and walking if he did work if at all possible. He then wrote a letter authorizing Conley to return to work. Conley did then take light duty for 2 or 3 days until he was ordered to go back to his regular shift. On August 6, 1982, Dr. Gottsch told Conley he could work with restrictions, and apparently wrote a letter to that effect. On December 8, 1982, Dr. Gottsch wrote a letter saying that Conley might attempt to return to work with restrictions—wearing a high top shoe, which Conley had been doing, and using an elastic bandage. On February 14, 1980, Conley told the claims agent about his 1979 injury, that the ankle would give out on him with minor pains, but was not incapacitating. In 1981, the ankle was about the same, with severe problems lasting a little bit longer when he got home.

In 1982, Conley would reinjure his ankle numerous times, and it got increasingly worse. He told Whitecotton of his 1979 injury and they discussed his limping and Dr. Gottsch's letter of August 6, 1982. On December 31, 1982, Whitecotton wrapped Conley's ankle, then told him to go out and complete his assigned duties. At Whitecotton's insistence, Dr. Gottsch wrote a letter saying that Conley might attempt to work with the restrictions of a high topped shoe and an elastic bandage.

The first disjunctive submission of Instruction No. 7 was erroneous in that there was no evidence that Conley was aware, i.e., that he knew or should have known that his performance of his regular duties was reasonably likely to cause him substantial harm. There is no evidence before the jury that anyone in the medical profession ever told him that and he, as a layman, could not be expected to reach such a medical conclusion. Indeed, the record is replete with advice to Conley that he could continue to work with restrictions. Thus, Instruction No. 7 was erroneously given, and prejudicially so because the jury was permitted, in following it, to reduce the amount of allowable damages. *Hart v. Midkiff, supra.* For this reason, the judgment must be reversed and the case remanded for new trial.

A closer question is involved in the second disjunctive submission in Instruction No. 7, as to whether Conley failed to advise defendant that the performance of his regular duties was aggravating his ankle condition, or that it was being made worse. There is no evidence that he ever specifical-

ly advised defendant of that fact. Fredrick testified that Conley did not ever complain about any injury to his ankle after he went back to work after light duty, or that going out working and walking in the yard made his ankle hurt. Whitecotton, however, must have known Conley was having trouble, as they discussed his limping, the doctors' reports, and he wrapped Conley's ankle once before sending him out to work. It is not necessary to rule the propriety of the second submission because the first submission was erroneously given as above held. These are disjunctive submissions, and each must therefore be supported by the evidence. *Saupe v. Kertz,* 523 S.W.2d 826, 830[4, 5] (Mo. banc 1975), and cases cited; *Weast v. Festus Flying Service, Inc.,* 680 S.W.2d 262, 267[6, 7] (Mo.App. 1984).

It is unnecessary to consider other contentions presented by plaintiff as they may not arise on new trial.

The judgment is reversed and the case remanded for new trial.

All concur.